Argued June 26, affirmed July 29, rehearing denied September 16, 1919.

# HINKSON v. KANSAS CITY LIFE INS. CO.

### (183 Pac. 24.)

**Insurance—Authority of Agent to Receive Premiums—Instructions.**

1. An instruction relative to authority of a general state agent of an insurance company to accept payment of premiums, "but you are further instructed that, if the officers had an opportunity to inform themselves of the facts and circumstances * * and failed to do so, it would be equivalent to such knowledge," was erroneous, being too broad; the mere opportunity to acquire knowledge not being equivalent to knowledge.

**Insurance—Authority of Agent—Payment of Premiums.**

2. Where an insurance company ratified the unauthorized act of a general state agent in accepting notes in payment of premiums and granting extensions, it became a question of fact as to whether the company, by such acts and conduct, had authorized and empowered the general agent to make and accept other premium notes and grant other extensions.

**Insurance—Authority of Agent—Question for Jury.**

3. In an action against an insurance company to recover premiums paid, where insurance company had cancelled the policies, whether defendant's general state agent had apparent authority to accept premium notes and grant extensions, contrary to the provisions of a life policy, *held* for the jury.

**Insurance—Life Insurance—Failure to Pay Premiums.**

4. Where the premium on a life insurance policy is not paid when due, and the payment thereof is not waived or extended by the insurer, the insurer may cancel the policy and retain premiums paid.

> [As to effect of failure to pay periodical premiums on policy of life insurance to terminate same in absence of provision for forfeiture, see notes in 26 L. R. A. (N. S.) 747; L. R. A. 1917B, 214.]

**Insurance—Life Insurance—Failure to Pay Premiums—Lapse of Policy.**

5. If a renewal premium was paid or extended by the execution of a premium note, and such note was not paid at maturity or at time to which it was extended, if extended, the insurer could cancel the policy.

**Insurance—Failure to Pay Premiums.**

6. A policy of life insurance automatically lapses without any further action on the part of the insurer, if the insured fails to pay a premium when the same becomes due, and within the time allowed by the terms of the policy.

**Insurance—Life Insurance—Time.**

7. Time is of the essence of a life insurance contract, and if insured fails to perform any condition on the date when it is due to be performed, then, without any further notice or act of the insurer, the policy lapses automatically, where no leeway or days of grace are allowed the insured.

**Insurance—Insurance Agent's Authority—Receiving Premiums.**

8. To establish that an agent outside of the home office of the insurance company had authority to accept renewal premiums on behalf of the company, it must be proved that either such agent was actually authorized by insurance company, or by his contract from the home office, or that the insurance company represented or held out the agent as having the authority; and also that the insured knew of and relied on the representations.

**Insurance—Authority of Agent—Ratification of Unauthorized Act.**

9. No payment of premiums to other than an authorized agent of an insurance company, or one held out as having authority, can be considered as a valid premium payment, unless the same was actually received by and consented to and ratified by the insurer.

**Insurance—Agency—Proof—Declarations of Agent.**

10. A declaration or statement made by an agent of an insurance company to the effect that he is authorized to collect premiums is of no effect and not binding upon the company.

**Trial—Instructions—Construction.**

11. It is not prejudicial error to give an incorrect instruction where, in view of the other instructions given and the testimony in the case, the jury could not have been misled.

**Insurance—Wrongful Cancellation of Policy—Recovery of Premiums—Amount.**

12. If an insurance company wrongfully declared a policy forfeited and refused to accept a premium when duly tendered, the insured may consider the policy at an end and bring an action to recover the just value of the policy, in which case the measure of damages is the amount of premiums paid with interest on each from the time it was made.

**Insurance—Limitation of Authority—Validity.**

13. Provisions in a life insurance policy to effect that agents shall not have authority to collect renewal premiums, and that company shall not be responsible for act of agent in accepting notes and extending payment thereon, are valid and binding between the insurer and the insured.

**Insurance—Limitation of Authority of Agent—Waiver.**

14. Provisions in a policy of life insurance limiting authority of agent and providing that agent has no authority to accept renewal premiums or accept notes, or grant extensions, etc., may be waived or modified by the insurer.

From Lane: George F. Skipworth, Judge.

In Banc.

In April, 1917, plaintiff filed his complaint in case No. 10,810, alleging that the defendant is a Missouri life insurance corporation, duly licensed to transact business in this state; that on March 31, 1914, plaintiff made application for a $10,000 policy with an annual premium of $400; that at the time of the application he paid the first premium, in consideration of which the defendant agreed that if it did not deliver the policy it would return the money; that defendant has never delivered the policy but has retained the payment and that at the time of the application the defendant through L. V. Rawlings, its agent, executed its receipt for the payment, a copy of which is attached to the complaint as Exhibit "A." .

The defendant admits its corporate nature and the application for the policy, that it has never delivered the policy and that Rawlings was its duly authorized agent, but denies the $400 payment or that it agreed to return the money. As a further and separate answer it alleges that at the time the application was made the plaintiff delivered to Rawlings his promissory note for $400, which was held by Rawlings until final action should be taken on the application; that after the application was made, the plaintiff, without any valid excuse or reason, did not present himself for medical or physical examination, and that no part of the note has ever been paid. In his reply the plaintiff specifically denies all of the new matter in the answer.

On August 24, 1917, the plaintiff commenced action number 10,811, in which he alleges that at his request the defendant issued its $5,000 policy No. 45,064 payable to the wife of plaintiff, by the terms of which the

plaintiff should pay the annual premium of $184.10 in advance on December 8th of each year, with one month's grace. The complaint states that:

"The first year's premium only may be paid to the agent. All subsequent premiums are due and payable in advance at the home office of the company without notice. However, they may be paid to an authorized agent of the company on or before the date when due, but only in exchange for a receipt signed by the president, vice-president, secretary or assistant secretary and countersigned by such agent. Upon failure to pay any premium on or before the date when due, or upon failure to pay any premium note when due, this policy will become null and void without any action or notice by the company, and all rights shall be forfeited to the company, except as hereinafter provided. No agent has power on behalf of the company to modify this contract, to extend the time of payment of the premiums, to waive any forfeiture, to bind the company by making any promise or representation, or to deliver any policy contrary to the provisions of section one (1) hereof. These powers can be executed only by the president, vice-president, secretary or assistant secretary of the company and will not be delegated."

It is further averred that:

"L. V. Rawlings was the general agent of the defendant corporation in Oregon and had charge of all of its business in Oregon, and as such general agent had the power from the defendant corporation to waive and modify each and all of the foregoing quoted conditions of the said policy and the said defendant corporation through its said general agent did waive or modify all of the said stated conditions of the said policy, except as herein expressed."

It is then alleged that the plaintiff paid the defendant the annual premium of $184.10 on December 8th of the years 1909, 1910 and 1911; that on December

8, 1912, he executed to the defendant his note for $184.10 with interest at 6 per cent, for an extension of time to June 8th following, within which to pay the premium which became due on December 8, 1912; that before the maturity of the note the defendant granted a further extension and on July 2,.1913, the plaintiff paid the note with accrued interest, amounting to $190.18; that on December 12, 1913, he paid the yearly premium which became due on December 8th of that year, and that by the terms of the policy no further premium would be due until December 8, 1914. The plaintiff says that he has paid to the defendant the sum of $920.50 in premiums on the said policy, all of which the defendant accepted through its general agent, Rawlings, and still holds and retains.

It is contended in the complaint that the plaintiff had fully kept and performed all of the terms and conditions of the policy except those which were waived or modified, until March 20, 1914, when the defendant notified him that it had rescinded and canceled the policy, at which time the plaintiff asked for a return of the premiums which he had paid and the defendant refused to make payment. The plaintiff alleges that he is the owner and holder of the policy and offers to return it to the defendant.

For a further and separate cause of action the plaintiff alleges that on December 8, 1909, on like terms and conditions the defendant issued to him its certain other policy, No. 45,065, for $5,000, upon which he paid like annual premiums of $184.10 for the years 1909, 1910 and 1911; that on December 8, 1912, to procure an extension to June 8, 1913, he executed his premium note bearing 6 per cent interest; that before the maturity thereof he obtained a further extension to July 2, 1913, when he paid the principal and

interest, amounting to $190.18; that on December 8, 1913, another premium became due and he paid it four days later, and that no further premium fell due until December 8, 1914. It is further alleged that on March 20, 1914, this policy was wrongfully canceled; that the defendant accepted through its agent and now retains all of the payments made on account of annual premiums, amounting to $926.68, and that the plaintiff has tendered the policy and demanded a return of his premiums.

The defendant admits the execution of policy No. 45,064 and the terms and conditions therein stated, as alleged. "Defendant further admits that L. V. Rawlings was the general agent of the defendant corporation in Oregon"; that "premiums were paid on said policy, carrying the same until December 8, 1912"; and that plaintiff "executed notes to this defendant becoming due December 8, 1913." All other material allegations of the complaint are denied, and as a further and separate answer the defendant alleges that among other things the policy provides that if the annual premiums were not promptly paid when due, the policy should lapse and "the premium payments made thereon should be forfeited to the company" without any further right on the part of the insured, the beneficiary or their assigns, against the corporation; that all premiums should be payable in advance at the home office, although they might be paid to an authorized agent before maturity, but only in exchange "for a receipt signed by the president, vice-president, secretary or assistant secretary and countersigned by such agent"; that "the plaintiff paid premiums on said policy and kept the same in force until the eighth day of December, 1912"; that thereafter the plaintiff executed his note payable June 8,

1913, for the amount of the premium due on December 8, 1913; that no part of said note has ever been paid; that since December 8, 1912, the plaintiff has not made any payments on the policy and that by reason thereof it has elapsed and all payments made thereon have been declared forfeited to the company.

A similar answer was made to the plaintiff's second cause of action, on policy No. 45,065, and to each answer he filed a general denial.

On August 24, 1917, the plaintiff commenced another action, No. 10,812, in which it is alleged that on February 14, 1911, the defendant issued to him its certain other $5,000 policy, No. 51,753, by the terms of which the annual premium of $192.65 was to be paid in advance on February 14th of each year. It is averred that this policy also contained the same terms and provisions set forth and alleged by the plaintiff in his complaint in case No. 10,811; that L. V. Rawlings was the general agent of the defendant and that as such he had power to waive or modify and did waive and modify all of the provisions above quoted. It is then alleged that the plaintiff paid the premium of $192.65 on February 14, 1911; that on February 14th of the year following, when the second premium was due, he was granted an extension of time to March 20, 1912, when he made the payment and it was accepted by the defendant as of February 14, 1912; that when the premium of February 14, 1913, became due, the plaintiff was granted another extension within which to make payment; that he paid the same on July 2, 1913, with interest, amounting to $120.49; that on January 13, 1914, he paid the defendant $69.02, which discharged the premium in full to that date and was so accepted by the defendant; that on the latter date he made a further payment of $192.65 for the pre-

mium falling due on February 14th of that year; that by the terms of the policy no further premium became due until February 14, 1915, and that the plaintiff paid to the defendant $766.66 in premiums upon the said policy, all of which the latter accepted through its general agent and now holds and retains.

It is next alleged that the plaintiff performed his part of the contract except as to the said conditions which were waived or modified as stated; that on March 20, 1914, the defendant wrongfully canceled the policy, and that by reason thereof the plaintiff offered to return it and demanded a refund of the amounts paid by him as premiums, which the defendant refused.

As another cause of action, the plaintiff alleges that on December 30, 1911, for value the defendant issued to him its certain other policy, No. 58,193, for $10,000, and that the premium thereon was $393.20, payable annually in advance on December 30th. ·In like manner the terms and conditions of the policy are pleaded, also that Rawlings was the general agent of the company with authority to waive and that he did waive or modify the conditions above noted. The plaintiff claims that he paid the annual premium on December 30, 1911, and alleges that when the second premium became due on December 30th of the year following he executed a 90-day note therefor, which was extended and paid with accrued interest on December 12, 1913; that when the third premium fell due he paid it within the one-month period of grace, on January 30, 1914; that the amounts so paid aggregated $1,202.01, and that all of such payments were made and accepted through the general agent of the defendant. Like allegations are made as to the cancellation of the policy

in March, 1914, plaintiff's ownership of the policy and his demand for a return of the premiums.

By way of answer to the first cause of action in case No. 10,812, on account of policy No. 51,753, the defendant admits the execution and delivery of the policy and the amount of the annual premium; that the policy contained the provisions alleged in the complaint; that "L. V. Rawlings was the general agent of the defendant corporation in Oregon"; that payment of the first annual premium was made as stated and continued the policy in force until May 14, 1912, with a quarterly payment; but specifically denies all other material allegations of the complaint and pleads the same affirmative defense as to nonpayment and forfeiture.

As to the second cause of action, on policy 58,193, the defendant admits the payment of the first premium; that on December 30, 1912, the plaintiff executed his note to the defendant for $393.20 and that the same was extended. As a further and separate answer it admits the execution of the note maturing March 30th and that it was renewed and extended until September 30, 1913.

The reply traversed all material allegations of both answers.

On November 7, 1917, the court made an order that the different cases should be consolidated, "the various actions to be tried as separate causes of action in the same case, and all the questions involved in the three cases to be submitted to the jury in this one trial."

When the plaintiff rested his case in chief the defendant moved to strike out all the evidence introduced by the plaintiff, "on the ground that the same had not been connected up with the company, but that all payments shown were made to L. V. Rawlings, who

was without authority to receive the same for the company." The defendant also moved for a nonsuit, "on the ground that plaintiff by his own evidence had failed to establish a case against the defendant for recovery of the claim sued for." The motions were overruled.

After both parties had rested, the defendant moved for a directed verdict, "except as to case No. 10,810, on the ground that there was no evidence at all showing authority in Rawlings, either to accept premium payments on behalf of defendant or to extend the time for their payment." This motion also was overruled and an exception allowed. The jury returned a verdict against the defendant for $5,504.82, the full amount of plaintiff's claim. At the same time it made and returned the following special verdict on question submitted to it by the court:

"Question one: How much is plaintiff entitled to recover in case No. 10,810?

"Answer: We, the jury, answer that the plaintiff is entitled to recover $487.20 in case 10,810.

"Question two: How much is the plaintiff entitled to recover in case No. 10,811?

"Answer: We, the jury, answer that the plaintiff is entitled to recover $2,477.86 in case 10,811.

"Question three: How much is the plaintiff entitled to recover in case No. 10,812?

"Answer: We, the jury, answer that the plaintiff is entitled to recover $2,539.76 in case 10,812."

A single judgment was entered on the verdict, for the full amount. The defendant then filed a motion for judgment notwithstanding the verdict or, in the alternative, that the judgment be set aside and a new trial be granted, for the reason that there was no competent evidence upon which to base the verdict; that it was against the law of the case, and for errors

which occurred at the trial, to which exceptions were duly taken. The motions were overruled and the defendant appealed, making forty-five different assignments of error, claiming that the court erred in the admission of any testimony concerning the payment of premiums to Rawlings and the extension and acceptance of overdue premiums by him, because he had no authority to accept payments or to grant such extensions and his unauthorized acts were never ratified or approved by the company; that all of the evidence introduced by the plaintiff as to payments to Rawlings or extensions thereof should have been struck from the record; that the court erred in overruling the motion for a nonsuit and in refusing to direct a verdict for the defendant on cases 10,811 and 10,812, and in giving a number of different instructions and refusing to give certain other instructions requested by the defendant.

The vital questions are whether L. V. Rawlings was authorized to accept payment of premiums after they became due, to take notes for such premiums, to grant extensions of time for the payment of such premium notes or to accept payment thereon; whether as such agent he had the power from the defendant to waive or modify the written provisions in the policies as to how, when and to whom the premiums should be paid, and whether there was sufficient evidence to submit the case to the jury.                    AFFIRMED.

For appellant there was a brief over the names of *Messrs. Wood, Montague, Hunt & Cookingham* and *Mr. Guy C. H. Corliss,* with oral arguments by *Mr. P. W. Cookingham* and *Mr. Corliss.*

For respondent there was a brief and an oral argument by *Mr. H. E. Slattery.*

JOHNS, J.—It appears from the corporate records of the home office of the company that the following cash payments were made on plaintiff's policies:

Number 45,064.

December 13, 1909...................$184.10
January 6, 1911....................  48.80
January 30, 1911...................  48.80
February 6, 1911...................  89.27
January 18, 1912...................  95.75
July 26, 1912......................  48.80
October 21, 1912...................  48.80

Number 45,065.

December 13, 1909.................$184.10
January 6, 1911....................  48.80
January 30, 1911...................  48.80
February 6, 1911...................  89.27
January 18, 1912...................  95.75
July 26, 1912......................  48.80
October 21, 1912...................  48.80

Number 51,753.

February 25, 1911.................$192.65
April 9, 1912......................  51.10

Number 58,193.

December 30, 1911.................$393.20

It is alleged and admitted that "L. V. Rawlings was the general agent of the defendant corporation in Oregon." The plaintiff testified that all of his payments were made to Rawlings and there is no claim or pretense that he ever made any payment in strict accord with the specific terms and provisions of the policy. It appears from the records kept at the defendant's home office that the plaintiff made his last payment on policy 45,064 on October 21, 1912, which extended that policy to December 8th of the same year, and at the

same time he made payment on policy 45,065, extending it to the same date; that on policy 51,753 the last payment was made on April 9, 1912, keeping that policy in force until May 14th of the same year; and that on policy 58,193 the annual premium was paid on December 30, 1911, extending that policy to the same date in 1912.

"For failure to pay premiums" all of the plaintiff's policies were canceled on March 20, 1914. There is nothing in the record which tends to show that the home office of the company directly notified the plaintiff at any time prior to March 20, 1914, that he was in default in the payment of any of his premiums, and so far as the record discloses, its letter of that date was the first communication which the home office mailed to the plaintiff.

The files of the insurance commissioner of the State of Oregon show that between September 25, 1909, and February 10, 1914, at different times the defendant made a number of applications for agents' licenses authorizing representatives to do life insurance business for it in this state; that each application for such licenses is dated and signed by "L. V. Rawlings, secretary or manager"; and that based upon these applications licenses were issued to a number of different individuals as agents of the company. It is undisputed that Rawlings had authority to, and did, appoint all of such agents; further, that Edith P. Richardson was appointed cashier of the company by the home office and that her office was in Portland, in the same room with that of Rawlings.

Several checks issued by the plaintiff to and in favor of L. V. Rawlings were introduced in evidence for the purpose of showing payments of the respective premiums on the different policies. These checks were

indorsed by "L. V. Rawlings" and "L. V. Rawlings, General, Agent."

It is shown by the records of the home office of the defendant that the total amount of payments which the defendant admits receiving as premiums on the different policies was $1,765.59, paid on and between December 13, 1909, and October 21, 1912. It appears from the dates of such payments that extensions from time to time must have been granted by someone. The annual premium on policy 45,064, which should have been paid on December 8th of each year, was $184.10, with one month's grace allowed, and a premium which should have been paid on December 8, 1910, was paid as follows: January 6, 1911, $48.80; January 30, 1911, $48.80; February 6, 1911, $89.27. Payments for the next year's premium were made as follows: January 18, 1912, $95.75; July 26, 1912, $48.80; October 21, 1912, $48.80. The same payments on the identical dates were made on policy 45,065. A quarterly payment of $51.10 was made on policy 51,753 on April 9, 1912, by which that policy was extended to May 14, 1912. The plaintiff and the defendant agree as to the time and amount of these payments.

It is expressly provided in the policies that "all subsequent premiums are due and payable in advance at the home office of the company without notice"; that "they may be paid to an authorized agent of the company on or before the date when due, but only in exchange for a receipt signed by the president, vice-president, secretary or assistant secretary and countersigned by such agent"; that "upon failure to pay any premium on or before the date when due, or upon failure to pay any premium note when due, this policy will become null and void, without any action or notice by the company"; and that "no agent has power on

behalf of the company to modify this contract, to extend the time of payment of the premiums, to waive any forfeiture or to bind the company by making any promise or representation, * * These powers can be executed only by the president, vice-president, secretary or assistant secretary of the company and will not be delegated." Yet in the face of such provisions, it appears from its own records that the defendant did accept the payment of a number of premiums after they became due and payable, and that extensions of time must have been granted the plaintiff for the payment of such premiums. He testifies that all of these payments were made to Rawlings. In 4 Words and Phrases, page 3048, it is said:

"A general agent is one who is employed to transact every business of a particular kind. * * A general agent is an agent who is empowered to transact all the business of his principal of a particular kind or in a particular place. * * A general agency exists when there is a delegation to do all acts connected with a particular trade, business or employment. * * General agency implies authority in the agent to act generally in all the business usually conducted by the principal. * * The terms 'general agent' and 'special agent' are relative. An agent may have power to act for his principal in all matters. He is then strictly a general agent. He may have power to act for him in particular matters. He is then a special agent."

As to policy 45,064, the plaintiff alleges that on December 8, 1912, to procure an extension to June 8, 1913, he executed his promissory note to the defendant for $184.10; that before the maturity of the note he obtained a further extension to July 2, 1913, at which time he paid the note with accrued interest, and that on December 8, 1913, another annual premium became due, which he paid four days later. Similar allega-

tions are made concerning policy 45,065. As to policy 51,753 the plaintiff alleges that when the second premium became due on February 14, 1912, an extension was granted him until March 20, 1912, at which time the premium was paid; that when the third annual premium became due on February 14, 1913, the defendant granted an extension to July 2, 1913, when the plaintiff paid a part of the premium, and was granted a further extension to January 30, 1914, when he paid that premium in full; that on the same date he also paid in full the premium which would become due on February 14, 1914, and by reason thereof the policy would remain in force until February 14, 1915. The defendant denies all of such payments, but in its answers alleges and admits, as to policy 45,064, that "the plaintiff executed notes to this defendant becoming due December 8, 1913, * * which note was drawn to mature June 8, 1913"; and that "this note was extended and renewed until December 8, 1913." Identical admissions and allegations were made by the defendant as to policy 45,065. As to the second premium on policy 58,193, the defendant admits and alleges that "on the thirtieth day of December, 1912, plaintiff executed and delivered to the defendant his note for $393.20, bearing 6 per cent interest, and that the time of payment was extended," also that the plaintiff "gave his note maturing March 30, 1913. Such note was renewed and extended until September 30, 1913." The defendant denies all other extensions and the execution of any other or different notes.

While it appears from the records in the home office of the defendant that policies 45,064 and 45,065 became subject to forfeiture on December 9, 1912, policy 51,753 on May 15, 1912, and policy 58,193 on January 1, 1913, it is significant that the only direct communication

from the defendant to the plaintiff was on March 20, 1914, when the defendant first notified him that the policies were canceled for nonpayment of premiums, and that on May 25, 1914, for the first time the defendant, through its president, notified its policy-holders that it had "discontinued the collection of renewal premiums" through its Portland office, and that:

"We will not recognize the receipt of any agent as evidence of the payment of a renewal premium. We therefore request that in the future renewal premiums be paid either direct to this office or in accordance with the premium notice which will be mailed you on or about the premium due date. The payment of renewal premiums to the Portland office, or any agent representing the Portland office, is confusing and might possibly be the means of your policy becoming delinquent. Mr. L. V. Rawlings has no authority to collect, receive or accept renewal premiums."

1. The instructions are very full and exhaustive, covering thirty typewritten pages. Complaint is made of the following charge on the subject of defendant's knowledge of the acts and conduct of Rawlings as its agent:

"But you are further instructed that if the officers of the company had an opportunity to inform themselves of the facts and circumstances relative to the payment of the premiums, and failed to do so, it would be equivalent to such knowledge."

It is apparent that this instruction is substantially copied from the opinion of this court in *Cranston* v. *West Coast Life Ins. Co.*, 72 Or. 116, 130 (142 Pac. 762), which cites Reinhard on Agency, Section 410. The trial court was justified in giving the instruction but such portion of that opinion was founded upon the authority of an agent to deliver a policy. It is somewhat broad when applied to the particular facts in

this case and is not sustained by the weight of authority. 1 Mechem on Agency, second edition, Section 403, reads thus:

"It must be kept in mind also that, where the law thus requires knowledge, it is ordinarily actual knowledge, and not merely the opportunity for acquiring knowledge, which is demanded. * * The principal where nothing has occurred to put him on his guard, is not bound to distrust his agent; he has the right to assume that the agent will not exceed his authority or practice fraud or commit crime; and he is not obliged, before accepting the benefits of an authorized act, to inquire whether, in performing it, the agent has not in some way violated his trust."

Section 404 of the same volume is as follows:

"At the same time, however, the principal cannot be justified in willfully closing his eyes to knowledge. He cannot remain ignorant where he can do so only through intentional obtuseness. He cannot refuse to follow leads, where his failure to do so can only be explained upon the theory that he preferred not to know what an investigation would have disclosed. He cannot shut his eyes where he knows that irregularities have occurred. In such a case, he will either be charged with knowledge, or with a voluntary ratification with all the knowledge which he cared to have."

Further quotations from the text are here set down:

"The facts, moreover, may be so patent that for the principal to profess ignorance would merely be to stultify himself. They may be so obvious that the principal, as a reasonable man, cannot be heard to say that he was ignorant of them. The duty to know them may be so interwoven with the proper conduct of the principal's business that he must, as an ordinary business man, be presumed to know them. This latter rule is constantly applied in the case of the directors of corporations, especially of banks, who are ordinarily presumed to know that which the proper performance of their duties would disclose." (Section 405.)

"It must also be kept in mind that the existence of actual knowledge may be found by inference like any other fact. This is not 'imputed' knowledge or 'presumptive' knowledge; but the fact of knowledge may be found, like any other fact, either from direct evidence, or from the existence of other facts and circumstances from which the fact of actual knowledge may properly be inferred, as in other cases. Any duty of the agent to inform his principal might be taken into account in determining the fact." (Section 406.)

"It is a fundamental rule that, if the principal elects to ratify any part of the unauthorized act, he must, so far as it is entire, ratify the whole of it. He cannot avail himself of it so far as it is advantageous to him, and reject it as to the residue. He cannot take the benefits and repudiate the obligations; and this rule applies not only when his ratification is express but also when it is implied, if the requirement of knowledge is satisfied. * * " (Section 410.)

"It is, moreover, as has been seen, a rule of quite universal application that he who would avail himself of the advantages arising from the act of another in his behalf must so far as it is entire also assume its responsibilities. If the principal has knowingly appropriated and enjoyed the fruits and benefits of an agent's act he will not afterwards be heard to say that any portion of the act was unauthorized. * * " (Section 435.)

In 25 Cyc. we find the following:

"The company is chargeable with knowledge or notice possessed by its officers or which should be in their possession in the ordinary performance of their duties." (Page 863.)

"If, by its course of dealing with insured, or by its general course of business known to him, the company misleads him into believing that the strict terms of the policy as to payment of premiums will not be insisted upon, it cannot afterward take advantage of a forfeiture thus induced." (Page 867.)

The following excerpts are taken from 31 Cyc.:

"Knowledge is not to be imputed to a principal by. reason of the mere fact that he had reasonable opportunity to acquire such knowledge." (Page 1256.)

"As a general rule the fact of agency cannot be established by proof of the acts of the pretended agent, in the absence of evidence tending to show the principal's knowledge of such acts, or assent to them. Yet when the acts are of such a character, and so continued, as to justify an inference that the principal knew of them, and would not have permitted the same if unauthorized, the acts themselves are competent evidence of agency." (Page 1662.)

The case was tried by the plaintiff on the theory that Rawlings was the general agent of the defendant; that the plaintiff made all of his payments to him as alleged in the complaint; that by its actions, conduct and course of business the company had waived and modified the specific terms and provisions of the policy as to where, when and to whom the premium payments should be made, and by whom extensions should be granted; that the plaintiff relied thereon and that the defendant wrongfully canceled his policies, by reason of which he was entitled to recover the amount of the premiums which he paid, with interest. The defendant relied upon the specific terms of the policies and denied any waiver or modification thereof, the authority of Rawlings to receive renewal payments or grant extensions for such payments, that plaintiff. had made payments other than those shown by the corporate records of the home office, that the defendant had received any notes other than those admitted, that Rawlings had any authority to take or receive premium notes, grant extensions thereon or that he was authorized to collect such notes, but alleged affirmatively that the plaintiff was in default as to his

premiums and that by reason thereof the defendant had the right to and did cancel his policies.

2. Rawlings was a general agent, and, assuming, as we must for the purposes of this opinion, that the plaintiff had all of his dealings with and made all of his payments to Rawlings, and the defendant having admitted that the plaintiff executed to it the four notes specified above and was granted the extensions thereon, coupled with the fact that the first direct communication to the plaintiff from the defendant's home office was on March 20, 1914, long after such notes were executed and such extensions were granted, it must follow that Rawlings took and accepted the notes and allowed the extensions. It would then become a question of fact as to whether such acts were approved and ratified by the home office. If this course of business was ratified by the company as to a given number of premium notes, it would then be a question of fact as to whether the company by its acts and conduct had authorized and empowered Rawlings as its agent to take and accept other premium notes and grant other extensions, as the plaintiff alleges, and as to whether the plaintiff was justified in dealing with the agent upon the assumption that he had such authority.

The recent case of *Sykes* v. *Sperow,* 91 Or. 568 (179 Pac. 488), after noting the hopeless conflict of authorities, makes this statement:

"Where the agent in question was the general agent of the company, created under the statute of the state as its only authorized agent, and being the only representative of the company within the state, we hold the better rule, and the one sustained by the weight of authority, to be that such a corporation cannot, by a general clause like the one in question, so limit the power of such general agent that he cannot waive a

provision like this, as to the mere method or manner of giving notice of the default of the subcontractor to the defendant company.''

2 Joyce on Insurance (2 ed.), Section 439, lays down the rule that:

''Any agent with general or unlimited powers, clothed with an actual or apparent authorization, may either orally, or in writing, waive any written or printed condition in the policy, notwithstanding such restrictions.''

Section 455 of the same volume says:

''Whenever a principal accepts the benefits of his agent's unauthorized acts with knowledge of all the material facts, he ratifies the same. Silent acquiescence with full knowledge of the material facts may amount to a ratification if continued for an unreasonable length of time, and third persons have acted in reliance upon and have been prejudiced by such acquiescence, especially where an agent, not a stranger, has exceeded his authority. In many cases a ratification will be inferred from the mere habits of dealing between the parties. Hence the policy of the company in dealing with its general agent in the matter of premiums had an important bearing upon the question at issue.''

On the subject of ratification of an agent's acts by the principal, 1 Mechem on Agency (2 ed.), reads thus:

''Ratification may briefly be defined as the subsequent adoption and affirmance by one person of an act which another, without authority, has previously assumed to do for him while purporting to act as his agent.'' (Section 347.)

''Ratification, moreover, differs from estoppel, though they are often very closely associated. Estoppel requires that the party alleging it shall have done something or omitted to do something, in reli-

ance upon the other party's conduct, by which he will now be prejudiced if the facts are shown to be different from those upon which he relied. Ratification requires no such change of condition or prejudice: if the principal ratifies, the other party may simply avail himself of it. As soon as ratification takes place, the act stands as an authorized one, and not merely as one whose effect the principal may be estopped to deny. If there be ratification, there is no occasion to resort to estoppel.'' (Section 349.)

''Ratification is an approval of a previous act or contract, which thereby becomes the act or contract of the person ratifying. It is not a *contract* to assume such liability. In the case of contracts, ratification is an affirmance of a contract already made, as it was made, and as of the date when it was made; and it is neither the making of a *new* contract to be bound by the *old* one, nor the making of a new contract in the terms of the old one.'' (Section 350.)

''The question seems to be this: From the failure to dissent under the circumstances, would the ordinary intelligent man be justified in inferring that the principal assented? Like other similar questions, this would be for the jury, unless reasonable men could fairly draw only one inference from the facts, and in that case the court may decide it.'' (Section 453.)

In *Melledge* v. *Boston Iron Co.,* 5 Cush. (Mass.) 158 (51 Am. Dec. 59), Mr. Chief Justice Shaw says:

''It seems to be now well settled * * since the great multiplication of corporations, extending to almost all the concerns of business, that trading corporations, whose dealings embrace all transactions from the largest to the minutest and affect almost every individual in the community, are affected like private persons with obligations arising from implications of law, and from equitable duties which imply obligations; with constructive notice, implied assent, tacit acquiescence, ratifications from acts and from silence, and from their acting upon contracts made by those professing to be their agents; and generally by those legal

and equitable considerations which affect the rights of natural persons."

From 31 Cyc. we quote the following:

"Ratification of the acts of an agent need not in most cases be express, but may be implied from the acts and conduct of the principal, and generally speaking a ratification may be implied from any acts or conduct on the part of the principal reasonably tending to show such an intention on the part of the principal to ratify the acts or transactions of the alleged agent, particularly where his conduct is inconsistent with any other intention, or where it appears that he has repeatedly recognized and approved similar acts done by the agent. * * Where an agency has been shown to exist the facts will be liberally construed in favor of the approval by the principal of the acts of the agent, and very slight circumstances and small matters will sometimes suffice to raise the presumption of ratification. Ratification is, however, a matter of intention, express or implied, on the part of the principal, and in order to establish an implied ratification there must be some acts or conduct upon his part which reasonably tend to show such intention. * * It is also the rule that as between the principal and third persons dealing with an agent less is required to constitute a ratification than is required between the principal and the agent." (Pages 1263–1266.)

"As a general rule the principal, upon learning of the unauthorized act of his agent, if he does not intend to be bound thereby, must within a reasonable time repudiate it." (Page 1275.)

"It is a well-settled rule, subject to certain exceptions, that a ratification relates back to the time when the unauthorized act was done and makes it as effective from that moment as though it had been originally authorized, and that therefore upon ratification the parties to all intents and purposes stand in the same position as though the person assuming to act as agent had acted under authority previously conferred." (Page 1283.)

In regard to premiums paid and accepted when past due, 14 R. C. L. says:

"To warrant a recovery where a premium is not paid when due, it is necessary to prove (1) the course of dealing between the insured and the insurer in reference to the acceptance of overdue payments amounting to a custom or habit; (2) that by reason of this course of dealing, the insured was justified in believing that the insurer would not insist on a forfeiture for failing to pay subsequent premiums; (3) that the insured believed he could postpone the payment of premiums without risking a forfeiture; and (4) that he acted on this belief, and therefore did not pay the premium at its maturity." (Page 1184, Section 361.)

"The cases are numerous which hold that the acceptance of a premium after the time when it should have been paid is a waiver of the forfeiture which might have been enforced because it was not paid when due. This rule applies, according to the better opinion, where the premium is received after it is due by an agent without power to waive forfeitures and is afterwards received and retained by the insurer without inquiry." (Page 1189, Section 367.)

"It is also a settled rule of law that where an insurer has knowledge of facts entitling it to treat a policy as no longer in force, and thereafter it receives a premium on the policy, it is estopped to take advantage of the forfeiture. It cannot treat the policy as void for the purpose of defense to an action to recover for a loss thereafter occurring, and at the same time treat it as valid for the purpose of earning and collecting further premiums." (Page 1190, Section 367.)

3. As the defendant admitted the payment of a large number of premiums in cash, and as the plaintiff testified that all of such payments were made to Rawlings, it then became a question of fact as to whether the plaintiff was justified in paying the disputed and undisputed premium notes to Rawlings as the defendant's general agent. The admitted facts, together

with all the other evidence and surrounding circumstances, were sufficient to take the case to the jury and there was no error in overruling the motion for a nonsuit and for a directed verdict.

4–11. Under exhaustive instructions the theory of the defendant was submitted to the jury, which was charged that—

If the company "did not hold out Rawlings to the public as possessing authority to collect premiums or renewals, or if the defendant did not know that Rawlings was collecting premiums, if he was collecting renewal premiums, or if by the exercise of ordinary prudence and caution could not have known, then the defendant would be entitled to a verdict at your hands. * * If Rawlings collected renewal premiums or extended the time of payment for renewal premiums and if the defendant received and collected such premiums with full knowledge of all the facts, then the defendant would be liable."

If it found that Rawlings did collect renewal premiums and the defendant had no knowledge of irregularity and received the money in good faith from the Portland office, through its cashier there, the jury was instructed to return a verdict for the defendant. Other parts of the charge follow:

"If you find from the evidence that any premium on any of the policies covered by this suit was not paid when due and that the payment of such premium was not waived or extended by the defendant, then you are to find for the defendant on the particular policy on which the premium was not paid.

"If any renewal premiums were paid or extended by the execution of premium notes and any such note was not paid at maturity, or at the time to which they were extended, if they were extended, then the policy on which said note was given lapsed and the plaintiff cannot recover thereon.

"If at any time the insured failed to pay a premium when the same became due and within the time allowed by the terms of the policy, or if the insured failed to pay any premium note when the same became due, and there was no extension of time or waiver of the payment of either the premium or the note, then the policy upon which said premium or premium note would have applied, forthwith automatically lapsed without any further action on the part of the company. * *

"You are instructed that time is of the essence of an insurance contract, and if the insured fails to perform any condition on the date when it is due to be performed, then without any further notice or action by the company the policy lapses automatically and no leeway or days of grace are allowed the insured.

"In order to establish that an agent outside of the home office had authority to accept renewal premium payments on behalf of the company, the plaintiff must prove either that such agent was actually authorized by instructions or by his contract from the home office to make the collections of such renewal premiums, or that the defendant company represented and held out 'the agent as having the authority to collect renewal 'premiums, and also that the plaintiff in this case knew of and relied on the representations by the company as to the authority of the agent. No payment made to other than an authorized agent as defined by this instruction can be considered as a valid premium payment as against the company, unless the same was actually received by, consented to and ratified by the home office of the company.

"Any declaration or statement made by any agent of the company to the effect that such agent is authorized to collect premiums is of no effect and not binding upon the company.

"If Rawlings did not have actual express authority to collect renewal premiums, then payments made by Hinkson to Rawlings on renewal premiums are not valid as against the company, unless the company affirmatively held Rawlings out to Hinkson as having this authority, or unless the premiums were turned

over to, accepted and ratified by the company, and then official receipt issued, signed by an officer.''

While the instruction as to the defendant's opportunity for knowledge is not sustained by the weight of authority, in view of all the other instructions which were given and the testimony in the record, we are of the opinion that it was not prejudicial and that the jury was not misled. On principle we are of the opinion that the instructions of the trial court last above quoted were correct.

12. The verdict was for the full amount of each alleged payment, with accrued interest. Upon the theory that the policies were in force until such time as they were canceled and that the plaintiff had the benefit of insurance, the defendant claims that it was entitled to a reduction or an offset. 2 Bacon on Benefit Societies and Life Insurance (3 ed.), Section 376, lays down this rule:

''If a company wrongfully declares the policy forfeited and refuses to accept the premium when duly tendered, and to give the insured the customary renewal receipt, evidencing the continued life of the policy, the assured has his choice of three courses: He may tender the premium and wait until the policy becomes payable by its terms and then try the question of forfeiture; or he may sue in equity to have the policy continued in force; or he may elect to consider the policy at an end and bring an action to recover the just value of the policy, in which case the measure of damages is the amount of the premiums paid with interest on each from the time it was made.''

This is sustained by 4 Ann. Cas. 124 and 9 Ann. Cas. 666.

13, 14. The defendant assigns as error the refusal of the trial court to give a number of its requested instructions. In so far as they were correct they were

embodied in the charge given. The defendant contends that—

"The limitation of authority and the provisions relating to the payment of premiums are valid and constitute a part of the contract between plaintiff and defendant."

That is the law and is sustained by the authorities which it cites. In legal effect the trial court so instructed the jury. But those authorities also lay down the rule that such limitations may be waived or modified by the company. We have examined the record with much care. The instructions were comprehensive and with the single exception noted were fair to the defendant.

The record presents a peculiar case. On December 8, 1909, the defendant issued to the plaintiff two life insurance policies of $5,000 each, which the defendant admits remained in force until December 8, 1912. On December 30, 1911, it issued to the plaintiff another policy, for $10,000, upon which the first premium was paid. It also admits that the plaintiff executed a number of extension premium notes in favor of it on such policies. Yet the fact remains that the first personal, direct communication from the home office to the plaintiff was on March 20, 1914, four years, three months and twelve days after the first policy was issued to him. On May 25, 1914, through a circular letter the defendant notified its policy-holders that it had "discontinued the collection of renewal premiums" through its Portland office and that Rawlings had no authority to collect, receive or accept annual renewal premiums. So far as the record shows, this was the first notice of that nature which ever issued from the home office of the company to its policy-holders.

There is ample evidence to sustain the verdict. The defendant's theory was fully and fairly submitted to the jury under proper instructions.

The judgment is affirmed.        AFFIRMED.

---

Motion to dismiss appeal denied September 10, 1918.
Argued on the merits, July 17, affirmed September 6, 1919.